# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

IPHONE 6S Plus, MODEL A1687
IMEI:358607072407794

) 
) 
) Case No. 1:18sw 15
) 
) 
) 

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated by reference).

located in the _____Eastern_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1) & 846 | Conspiracy to Distribute Controlled Substances (THC) |

The application is based on these facts:
See attached affidavit of Jose Juan Oquendo, ATF Special Agent

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jose Juan Oquendo, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 01/05/2018

City and state: Alexandria, Virginia

/s/
_____
Theresa Carroll Buchanan
United States Magistrate Judge

*Judge's signature*

The Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>IPHONE 6 Plus, MODEL A1522<br>IMEI: 35488068529172<br><br>IPHONE 6S Plus, MODEL A1687<br>IMEI:358607072407794<br><br>CURRENTLY LOCATED AT 7799<br>LEESBURG PIKE SUITE 1050N, FALLS<br>CHURCH, VA 22043 | No. 1:18-sw- 15  |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Jose Juan Oquendo, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from the devices of electronically stored information described in Attachment B.

2. I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2014. Prior to my appointment with the ATF, I was a sworn law enforcement officer with the United States Secret Service for 2 years. I am currently assigned to the ATF Falls Church Group II Field Office. In my capacity as a law enforcement officer, I have investigated individuals for the illegal possession and use of firearms; for the illegal possession and distribution of controlled substances; for committing violent crimes; and for dealing in the business of firearms without a valid license.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. The property to be searched is listed below (hereinafter referred to as "Device #1 and Device #2," collectively, The "DEVICES"). The Devices are currently located in the ATF Falls Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia. The Devices include the following:

| Number | Description | Serial or Other Number | Reference in Affidavit |
|---|---|---|---|
| 1 | IPHONE 6 Plus, Model: A1522 | IMEI: 35488068529172 | Device #1 |
| 2 | IPHONE 6S Plus, Model: A1687 | IMEI: 358607072407794 | Device #2 |

5. The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## BACKGROUND OF THE INVESTIGATION

6. In March 2017, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Federal Bureau of Investigation (FBI) began jointly investigating the Imperial Gangsta Bloods ("IGB") street gang within Northern Virginia area and elsewhere. IGB is a subset of the United Blood Nation ("UBN") street gang. Members of the UBN and IGB set are known by law enforcement to be involved with narcotics distribution, firearms trafficking, home invasions, robberies, assaults and homicides.

7. During the course of this investigation, law enforcement learned that members of the Northern Virginian IGB set are actively conspiring with NASIRU CAREW of Woodbridge,

2

Virginia, to distribute marijuana, THC, and firearms. CAREW's main residence appears to be located in San Diego County, California. However, CAREW regularly travels to the Northern Virginia area. During the course of this investigation, agents have determined that CAREW leads an organization responsible for sending multi-pound shipments of THC gummies to the Northern Virginia area. The THC gummies are in the brand name "Gummy 420". CAREW uses the United States Postal Service (USPS), the United Postal Service (UPS), and FedEx to ship the THC gummies. Many suspects have expressed their fear of CAREW.

## PROBABLE CAUSE

A. <u>Controlled Parcel Delivery to a Fredericksburg, Virginia Address on May 8, 2017</u>

7. On May 8, 2017, a U.S. Postal Inspector informed the FBI that two suspicious parcels were possibly connected to CAREW's distribution organization. The parcels had labels similar to packages that had previously been delivered that day and had been found to contain THC-laced gummies. The parcels were identified to be en route to an address located in Fredericksburg, Virginia. This address was identified as belonging to an automotive repair shop.

8. Law enforcement officers established surveillance on the address located in Fredericksburg, Virginia and observed a white male bring in one of the packages, and an African-American male bring in one of packages. The African-American male then drove away from the address. The Stafford County Police Department then conducted a traffic stop on the vehicle due to a traffic violation. The driver was identified as ROBERT EVANS, the same African-American male they had previously observed bringing in one of the packages. EVANS alerted officers that he was in possession of a pistol, which agents located on the driver side floorboard. Agents found the pistol to be loaded. EVANS then gave consent to search his vehicle. No USPS parcels were located in the vehicle. However, officers located a Wells Fargo

bank deposit slip for account number XX3306 that documented a deposit in the amount of two thousand five hundred dollars ($2,500) made in twenty dollar ($20) bills. The bank account number XX3306 had previously been found on CAREW's cell phone in the notes section with the name "Mummy" as the account owner. Law enforcement knows that the name "Mummy" is a nickname CAREW calls his girlfriend.

9. Based on their familiarity with similar packages that had been found to contain THC gummies that day, law enforcement officers arrested EVANS on a Virginia state charge of conspiring to violate the drug controlled act and seized EVANS's cellphone, which EVANS had retrieved from his person. Law enforcement officers asked EVANS for his cell phone number and EVANS replied xxx-xxx-9736. Law enforcement officers asked if the cell phone belong to him and EVANS replied "yes".

10. Simultaneously, different law enforcement officers were interviewing the white male individual ("Witness 1") at the automotive shop in Fredericksburg. Witness 1 stated that he is the owner of the automotive repair shop and that EVANS worked at the business with him. Witness 1 stated the postal delivery person dropped off two parcels at his shop that day. EVANS told Witness 1 the parcels were EVANS's. Witness 1 stated that he looked at the name on the parcels and did not recognize the names on the parcels; they were not in EVANS's name. Witness 1 stated that EVANS is a friend and has received parcels similar to the two parcels currently at the business and that he would sell THC gummies while working at the store. Witness 1 stated that EVANS would sell the bag for twenty dollars ($20) per bag.

11. Witness 1 gave consent to open the USPS parcels that were inside his shop. Law enforcement found and seized approximately 20 pounds of THC laced edibles, brand name "Gummy 420", which were packaged in vacuum-packed, heat-sealed plastic bags. Videos of

"Gummy 420" brand edibles have also been seen posted on the social media accounts of known CAREW co-conspirators.

12. After EVAN's arrest, an ATF agent noticed that EVANS's cellphone received and was in the process of receiving Snapchat messages. The messages were from Snapchat vanity name "Nasty's WORLD." Nasty's WORLD vanity name is associated with CAREW. Agents also saw there were two missed FaceTime calls from a (619) area code number. This area code is associated with San Diego, California. Law enforcement took a picture of the messages, which were being typed in real-time to EVANS's cellular phone. The Messages stated "Nasty's WORLD is typing".

13. On May 9, 2017, law enforcement again interviewed Witness 1. Witness 1 stated that EVANS returned to the store after being released from jail. EVANS told Witness 1 not to speak to law enforcement and that there would be no way to prove that the THC gummies were his. EVANS also showed Witness 1 his thumb where he had chewed his finger print off because he knew that law enforcement needed his fingerprint to unlock his cell phone.

14. Witness 1 stated that EVANS told him he owed his supplier $2,000 for the gummies. Witness 1 stated that EVANS told Witness 1 that his supplier is from Africa, lives in California, and travels to Virginia occasionally. Witness 1 stated that EVANS told him that he was scared of his supplier and that his supplier was forcing him to sell THC gummies. Witness 1 further stated that he recognized the name "Nasty's WORLD" as the Snapchat name EVANS uses to contact his supplier.

15. On October 25, 2017, Witness 1 spoke with law enforcement and Assistant United States Attorneys at the U.S. Attorney's Office, Eastern District of Virginia, in Alexandria, Virginia. At that time, Witness 1 told law enforcement that he had known EVANS to distribute

marijuana for six or seven years. Witness 1 stated that in the last year, Witness 1 has known EVANS to also distribute marijuana products, to include THC gummies. Witness 1 has seen marijuana, marijuana products, a gun, and a money machine in the book bag that EVANS carries on his person.

16. On December 4, 2017, The Honorable Theresa Carroll Buchanan, United States Magistrate Judge for the Eastern District of Virginia, authorized an arrest warrant for EVANS for conspiracy to distribute THC, a Schedule 1 controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) & 846.

17. On December 6, 2017, the United States Marshal Service (USMS) arrested EVANS at his residence located in Woodbridge, Virginia. At the time of the arrest, the USMS recovered the DEVICES, which were located on the nightstand in EVANS bedroom. The DEVICES were next to EVANS's wallet on the nightstand. Law enforcement asked about the DEVICES and EVANS stated that one of the DEVICES was broken and the other was his girlfriend's. EVANS was then transported to a location in Manassas, Virginia and placed in an interview room, where ATF special agents advised EVANS of his *Miranda* rights and stated they were seeking EVANS cooperation. EVANS indicated that he did not want to cooperate and the interview was terminated. The USMS transferred the DEVICES to ATF custody later that day.

18. In my experience, it is not uncommon for drug distributors to have more than one phone to conduct their illicit business. Many dealers will have separate phones for customers, sources, family etc. While agents cannot guarantee all DEVICES are owned or used by EVANS, the only way to determine this information is to access the devices and search them. Agents will minimize their access and search of the data if determined not to be owned or used by EVANS.

19. The DEVICES are currently in the lawful possession of ATF at 7799 Leesburg Pike Suite 1050N, Falls Church VA 22043, within the Eastern District of Virginia. In my training and experience, I know that the DEVICES has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICES first came into the possession of ATF.

20. After a search warrant is obtained for the DEVICES, ATF or FBI will begin the search of the Devices within the Eastern District of Virginia. If ATF or FBI cannot complete the search, then agents will send the Devices to a private company that specializes in data extraction from Apple iPhones and other electronics. This private company will either (a) unlock the Device and then return the Device to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Devices will take place or (b) unlock the Devices and create a forensic image of the Devices, and then return the Devices to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Devices will take place.

## USE OF CELLULAR TELEPHONES BY UNLAWFUL DRUG TRAFFICKERS

21. Based upon my knowledge, training, and experience, I know that cellular telephones are a tool of the drug trade. Drug traffickers communicate with customers, suppliers, and coconspirators via cellular telephones. Drug traffickers use cellular telephones to arrange meetings, order drugs, take controlled substance orders, and arrange for coconspirators to obtain and distribute drugs. Drug traffickers also use cellular telephones to take photographs of themselves and associates with drug products and/or property derived from their criminal activities. To avoid detection by law enforcement, drug traffickers commonly use more than one cellular telephone and often send text messages, rather than engage in oral communications.

22. Cellular telephones used by drug users contain valuable information and evidence relating to their drug use. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking of drugs; (ii) identify locations where drug traffickers traveled to before and after transporting or selling drugs; (iii) reflect the ownership and use of the cellular telephones by the drug traffickers; (iv) document meetings and communications between drug traffickers, their customers, associates, and coconspirators; (v) reflect communications between drug traffickers and other individuals, discussing the trafficking of drugs; (vi) reflect communications between drug traffickers and other individuals who may have assisted or provided support in the trafficking of drugs; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of drugs relating to the trafficking of controlled substances; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of controlled substances.

23. Indeed, during the course of this investigation, ATF has already obtained evidence of drug trafficking and illegal possession of firearms from EVANS's cellular telephone communications. As set forth above, law enforcement had previously observed CAREW communicate with EVANS using his cellphone.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

11

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, I know that the DEVICES have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the DEVICES.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the DEVICES. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICES were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine DEVICES already in law enforcement's possession, the execution of this warrant does not

involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the DEVICES described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Jose Juan Oquendo
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed and sworn to before me on January 5, 2018

/s/
_____
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

14

## ATTACHMENT A

The property to be searched is listed below (hereinafter referred to as the "DEVICES"). The DEVICES are currently located in the ATF Falls Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia. The DEVICES include the following:

| Number | Description | Serial or Other Number | Reference in Affidavit |
|---|---|---|---|
| 1 | IPHONE 6 Plus, Model: A1522 | IMEI: 35488068529172 | Device #1 |
| 2 | IPHONE 6S Plus, Model: A1687 | IMEI: 358607072407794 | Device #2 |

## **ATTACHMENT B**

1. All records on the DEVICES described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled substances), and involve Robert Evans, including:

   a. any conversations, whether through text messages or other applications, where Robert Evans discusses controlled substances or firearms;

   b. lists of customers and related identifying information;

   c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e. any information related to sources or purchases of firearms;

   f. any photographs of controlled substances or firearms; and

   g. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.